**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

NATURAL LANDS, LLC,

      Plaintiff,                                Case No.:

v.

CITY OF BOCA RATON and
GREATER BOCA RATON BEACH AND
PARK DISTRICT,

      Defendants.

_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**INTRODUCTION**

1.     NATURAL LANDS owns a parcel of land (PARCEL) located at 2500 North Ocean Boulevard, Boca Raton, Palm Beach County Florida.  The PARCEL is situated on the east side of State Road A1A and extends from the eastern right-of way boundary for State Road A1A to the approximate mean high water line of the Atlantic Ocean.  The PARCEL is undeveloped, rectangular shaped and contains approximately 14,114 square feet (0.32 acres) with approximately 88 feet of frontage on State Road A1A. It is raw beachfront property that includes dunes and the dry sand beach.

2.     The PARCEL and a parcel directly west of the PARCEL  was purchased by NATURAL LANDS' predecessor in interest on August 2, 2011 for $950,000.00 and is more particularly described as "that portion of the south 75.00 feet of Lot 24A and the north 12.50 feet of  Lot 25A of REDLHAMMER SUBDIVISION lying between the easterly right-of-way line of state road A1A and approximate mean high water line of the Atlantic Ocean subject to an easement over the north 12.50 feet of Lot 25A, for access to the ocean beach residents along

1

property of Lake Wyman Road".  The conveyance to NATURAL LANDS was via Special Warranty Deed and recorded in Official Records Book 24667, Page 940 of the Public Records of Palm Beach County, Florida. A copy of the Deed to NATURAL LANDS is attached hereto as **Exhibit 1** and incorporated by reference herein.

3.      When the west parcel was conveyed independently to a new owner, the PARCEL was conveyed to NATURAL LANDS.

4.      The PARCEL is designated by the CITY's Comprehensive Plan Future Land Use Map as Residential Medium (RM).  The CITY's  Future Land Use designation of Residential Medium allows and acknowledges that lot owners within that boundary will be able to develop their lots with family dwelling structures.

5.      The PARCEL is designated Residential Multifamily (R-3-F) on the Official Zoning Map adopted by the CITY.  The R-3-F zoning designation permits lot owners to build up to two (2) family dwelling structures on the lot.  At minimum, lot owners who are zoned R-3-F possess a vested right to build one single family home on their lots.

6.      Beginning on October 27, 2011, NATURAL LANDS, began the application process with the CITY for approval to build one (1) single family home on the PARCEL.

7.      On July 23, 2019, after nearly eight (8) years with over 4 separate applications to the CITY and its various departments, and after approval to build east of State Road A1A and the Coastal Construction Control Line ("CCCL") was granted by the State of Florida's Department of Environmental Protection, the CITY denied NATURAL LANDS application to build a single family home on the PARCEL.

8.      As a result of the CITY'S denial, NATURAL LANDS is unable to build even one single family home on the lot or use the lot in any reasonably meaningful manner.  Therefore,

35993372.5

NATURAL LANDS has lost all economic or beneficial use of the PARCEL as a result of the CITY's denial of all reasonable uses.

<u>**PARTIES/JURISDICTION AND VENUE**</u>

9.      Plaintiff, NATURAL LANDS, LLC ("NATURAL LANDS"), is a Delaware limited liability company.

10.      Defendant, CITY OF BOCA RATON ("CITY"), is a municipal corporation in Palm Beach County, Florida and is a citizen of the State of Florida, acting through its City Council ("COUNCIL").  Other sub entities of the CITY which are controlled by it and are relevant in this matter are the CITY's Zoning Board of Adjustment ("ZBOA") and the CITY's Environmental Assessment Board ("EAB").

11.      Defendant, GREATER BOCA RATON BEACH AND PARK DISTRICT ("DISTRICT"), is a special taxing district initially established by the Florida Legislature in 1974 and is a citizen of the State acting through its Board of Commissioners ("BOARD"). Under Florida law, the DISTRICT has the authority to levy taxes and exercise eminent domain power for the purpose obtaining, operating, and maintaining beaches and parks within a designated portion of the CITY boundary.

12.      This is an action in inverse condemnation and in tort for damages that exceed seventy-five thousand dollars ($75,000.00) exclusive of interest, attorney's fees, and costs.

13.      Pursuant to the 5th Amendment of the United States Constitution, no person may be deprived of property without due process of law and just compensation paid therefor.

14.      Pursuant to the 14th Amendment of the United States Constitution, no State may deprive any person of life liberty or property without due process of law nor deny any person within its jurisdiction the equal protection of the laws.

3

15.     This court has jurisdiction under 28 U.S.C. § 1331 because the Plaintiff raises questions under the U.S. Constitution and 42 U.S.C. §1983 and 28 U.S.C. § 1343(a)(3) because the Plaintiff challenges the CITY's deprivation of its rights under color of state law; and under 28 U.S.C. §2201 because the Plaintiff seeks declaratory and injunctive relief.

16.     The US District Court for the Southern District of Florida is the appropriate venue because the Defendants reside in this District, 28 U.S.C. §1391(b)(1) and a substantial part of the events or omissions giving rise to this claim occurred within this District, 28 U.S.C. §1391(b)(2). Moreover, according to the local rules of the Southern District, the West Palm Beach Division is the appropriate venue because the cause of action arises in Palm Beach County, Florida.

## ALLEGATIONS COMMON TO ALL COUNTS

### A.     History of the PARCEL

17.     The PARCEL that is the subject property of this lawsuit has a lengthy history in Palm Beach County, Florida. It is one of three remaining properties, in this immediate area, that are east of State Road A1A in the CITY  and are developable as a single or multi-family residence. A second nearby lot east of State Road A1A less than 400 feet away from the PARCEL (the Petruzzelli lot) has already been improved with two (2) single family residence structures and was already the subject of a successful challenge to the CITY's denial of the owner's right to build on the lot. The third lot east of State Road A1A (the Sweetapple lot) remains undeveloped.

18.     On February 2, 1932, the PARCEL was contained within Fractional Section 16, Township 47 South, Range 43 East, as set forth in a plat recorded by the Florida Inland Navigation District at Plat Book 17, page 28 of the Public Records of Palm Beach County,

Florida.  A copy of the Florida Inland Navigation District Plat has been attached hereto as **Exhibit 2** and incorporated by reference herein.

19.     On November 18th, 1944, the Redlhammer Subdivision was recorded at Plat Book 20, page 37 of the Public Records of Palm Beach County, Florida by Albert and Elizabeth Redlhammer. In the Redlhammer Subdivision Plat, Fractional Section 16, Township 47 South, Range 43 East was subdivided into sixteen (16) lots all generally long and rectangular in shape and extending lengthwise east to west from the west line of Fractional Section 16 or the approximate mean high water line (MHWL) of the Atlantic Inter Coastal Water Way (f/k/a Lake Wyman) to the approximate MHWL line of the Atlantic Ocean.  A copy of the Redlhammer Subdivision Plat is attached hereto as **Exhibit 3** and incorporated by reference herein.

20.     In the Redlhammer Subdivision plat, each long rectangular lot was platted at least 100 feet in width and each lot contained a perpetual public dedication of 100 foot right-of-way for State Road A1A (F/K/A State Road 140), which runs north to south through the approximate eastern ¼ of all lots in the plat.

21.     The lots in the Redlhammer Subdivision plat were numbered Lot 14 through Lot 26 with the portion of the lot situated east of the publicly dedicated right-of-way for State Road A1A being designated with the letter A.  Therefore a typical subdivision lot in the Redlhammer Subdivision would be the combined Lot 14 (denoting the majority portion of the lot west of the dedicated right-of-way)and Lot 14A (denoting the smaller portion of the lot east of the dedicated right-of-way).

22.     As platted, Lots 14A through 26A were generally rectangular in shape, measuring between 100.27 feet and 101.31 feet wide on the east boundary of the dedicated State Road A1A

right-of-way, and between approximately 155 feet to 76 feet long from the east boundary of A1A to the approximate MHWL of the Atlantic Ocean.

23.     Between November 18, 1944 and the present day, Redlhammer Subdivision Lot 24 and 25 and Lot 24A and 25A have been subdivided and sold with each smaller parcel being used to build a single family home or larger structure.

24.     On September 20, 1963, in a warranty deed between Bruce Marchand and Bertha Marchand and Frank Lamping and Mary Lamping recorded at Official Records Book 920, page 1084 of the Public Records of Palm Beach County, Florida, land representing the PARCEL was configured into its present day existing dimensions.  A copy of the Warranty Deed is attached hereto as **Exhibit 4** and incorporated by reference herein.

25.     The Subject PARCEL is a rectangular lot containing a portion of Lots 24A and 25A from the Redlhammer Subdivision plat is 88 feet wide and approximately 131 feet in length from the east boundary of A1A to the approximate MHWL of the Atlantic Ocean. At 14,231 square feet or 0.32 acres, it is the same size or larger than any smaller parcel from Lots 24 or 25 or Lots 24A or 25A that have been developed into a single family home or larger structure within CITY limits.

        **B.**      **History of Zoning Regulations Affecting the PARCEL**

        **1.**      **Palm Beach County**

26.     At the time of the Redlhammer Subdivision plat recording in 1944, the PARCEL was located in unincorporated Palm Beach County and not within the boundary of the CITY.  As a result, the PARCEL was subject to whatever zoning regulations or restrictions were adopted by Palm Beach County.

27.     On May 13, 1957, the Palm Beach County Board of County Commissioners adopted Zoning Resolution Number 3-57, containing nine (9) zoning districts.  Four (4) of the zoning districts were designated residential, with the zoning code providing for existing and future needs.

28.     The four (4) residential districts adopted by Palm Beach County under its Resolution No. 3-57 were divided as follows:

*      R-1AA - Single Family Dwelling District - minimum lot width of 80 feet.

*      R-1A - Single Family Dwelling District - minimum lot width of 60 feet.

*      R-1 - Single Family Dwelling District - minimum lot width of 60 feet.

*      R-2 - Multiple Family Dwelling District:

            Single Family Structures – Minimum lot width of 60 feet.

            2 Family Dwelling Structures – Minimum lot width of 70 feet.

            4 Family Dwelling Structures or more- Minimum lot width of 85 feet.

29.     The PARCEL, with a width of 88 feet, easily met the minimum lot width for development in any residential district in Palm Beach County in 1957.

30.     In 1957, real property parcels in Palm Beach County which did not meet minimum standards under the newly adopted zoning code were known as "nonconforming lots".

31.     Palm Beach County also adopted a grandfathering provision for nonconforming lots under Zoning Resolution 3-57, Section 6. It provided that "where a lot has an area or width that does not conform to the requirements of the district in which it is located but was a lot of record at the time of adoption of  the resolution, the lot may be used for on family dwelling provided the minimum yard requirements of the district in which it is located are maintained."

32.     Even at its current dimension of 88 feet wide, the PARCEL has always met the

dimension requirements of even the earliest Palm Beach County zoning ordinances with regard to the ability of its owner to erect a single family home.

## 2.     City of Boca Raton

33.     On October 25, 1955, 75 foot wide portion of the PARCEL was annexed into the CITY boundary; on December 21, 1956, the remainder of the PARCEL was annexed by the CITY.  A copy of CITY Ordinance Number 249 and CITY Ordinance Number 269 annexing the PARCEL are attached hereto as **Composite Exhibit 5** and incorporated by reference herein.

34.     At that time, the CITY's earliest zoning code, Ordinance Number 253, Section 23-39 required annexed properties to be automatically classified as R1A, which permitted a residential structure to be built on lots a minimum 75 feet in width. Further, under Ordinance 253, Section 23-59, any lot of record of at least 50 feet in width that was platted before August 18, 1941 could be used for one family dwelling as of right.  Lastly, Ordinance 253 contained a grandfathering provision for lawful uses of land that, as of February 28, 1956,  had become non-conforming.  The PARCEL met all conditions to allow use for a single family detached dwelling as of right.    A copy of CITY Ordinance Number 253 is attached hereto as **Exhibit 6** and incorporated by reference herein.

35.     On November 4, 1969, CITY Ordinance 1395 rezoned the PARCEL and all other properties east of the right-of-way for State Road A1A from R-4 to R-5-A. The 1969 rezoning permitted a single family home as of right, but the R-5-A zoning now required all lots east of A1A to have a minimum lot width of 100 feet. However, no grandfathering provisions allowing for existing uses were repealed and those portions of the CITY's Zoning Code from CITY Ordinance Number 253 remained in effect.  A copy of CITY Ordinance 1395 is attached hereto as **Exhibit 7** and incorporated by reference herein.

35993372.5

36.     In 1976, the CITY Ordinance Number 2271 rezoned lots east of A1A from R-5-A to R-3-F, which retained the same requirements as the R-5-A zoning (100 foot minimum width) and permitted a single family home as of right. Again, no grandfathering provisions were repealed.  A copy of CITY Ordinance 2271 is attached hereto as **Exhibit 8** and incorporated by reference herein.

37.     Pursuant to Chapter 28 of the CITY's current Code of Ordinances, the CITY's R-3-F zoning requirements east of A1A at the location of the PARCEL remains unchanged from 1976, except for a Building Height definition change that was adopted by the CITY in 2017 for express purposes of causing a severe diminution in value for the PARCEL.

### C.     History of Applications to the CITY to Develop the PARCEL For a Residential Dwelling Prior to NATURAL LANDS' Ownership

38.     Beginning in 1997, several prior applications to the CITY were made for permission to either develop the PARCEL as a single family home or to use the vested development rights from the parcel in a larger development on another nearby property.  All previous applications to develop the PARCEL were denied despite the fact that the PARCEL has a vested right to be developed with two single family dwelling units.

39.     In 1997, an application for approval of a Planned Unit Development on combined Lot 24 (street number 2501 North Ocean Drive--west of State Road A1A) and the Subject PARCEL (street number 2500 North Ocean Drive--east of State Road A1A) was filed with the CITY. The applicant proposed combining all the development rights for both lots for a multifamily development on Lot 24. The CITY approved three units for Lot 24 with none on the PARCEL, however, the applicant abandoned the project.

40.     In 2000, an application for approval of a single family home on the PARCEL was submitted to the CITY; however, ultimately the applicant abandoned the project without requiring the CITY to vote on approval or denial.

41.     In 2002, an application for approval of a 7 story, 5 unit condominium for LOT 24 (street number 2500 North Ocean Drive--west of State Road A1A) was filed with the CITY.  The applicant sought to transfer vested development rights from the PARCEL to LOT 24 and to preserve the PARCEL in its natural state.  The application was denied by the CITY's Zoning Board of Adjustment ("ZBOA") and then denied by the CITY's COUNCIL in 2003.

42.     Unsurprisingly, the CITY was successfully sued by a neighboring beach parcel owner to the south, I. Mario Petruzelli, when it also denied him the right to build a single family residence on a his lot which is narrower than the PARCEL.

43.     The CITY has clearly shown prejudice against all applications to develop the PARCEL with a single family dwelling while recognizing that the PARCEL is vested with the right to develop a single family detached dwelling.

**D.     History of Applications by the Plaintiff, NATURAL LANDS to the CITY to Develop the PARCEL for a Single Family Detached Dwelling.**

**1.     First Application by NATURAL LANDS to CITY---2011 to 2014**

44.     The Plaintiff in this action, NATURAL LANDS, purchased the property on August 11, 2011.

45.     At the time of purchase, the PARCEL was zoned R-3-F on the Official Zoning Map of the CITY.  The zoning designation allows for a multiple family detached dwelling of up to four (4) units.

46.     The normal procedure to obtain approval to construct a single family detached dwelling in the CITY within the zoning designation R-3-F is for the property owner to make an

10

application to the CITY for a permit. Normally, the application is considered by CITY staff and the permit is granted, especially where the request is for a property use that is as of right. However, based on the beachfront location of the PARCEL, the CITY did not follow any normal procedure and grant permission that should have been as of right.  Instead, the CITY spent the next eight (8) years erecting roadblock after roadblock to prevent NATURAL LANDS from constructing a single family detached dwelling on the PARCEL and ultimately depriving it of all economic and beneficial use of the PARCEL.

47.    On October 27, 2011, NATURAL LANDS filed an application with the CITY for Planning Advisory Review ("PA") for authorization to construct a single family detached dwelling on the PARCEL.  Rather than determine what could be done as of right, the CITY demanded several applications for zoning variances be filed to despite the fact that the lot could be developed with a single family detached dwelling as of right.

48.    Initially, the CITY determined that a Lot Width Variance Application and a Front Yard Setback Variance Application would be required to build a single family home on the PARCEL.

49.    NATURAL LANDS filed its applications for Lot Width Variance and Front Yard Setback Variance soon after its October 27, 2011 meeting with the CITY.

50.    On November 8, 2011, the CITY informed NATURAL LANDS that the PARCEL lies seaward of the Coastal Construction Control Line ("CCCL") established by the Florida Department of Environmental Protection ("FDEP") and required an additional application to build seaward of the CCCL.

51.     Based on encouragement received from CITY staff, NATURAL LANDS hired a marine engineer and a biologist who worked with FDEP over the next six (6) months to remove state objections to constructing the single family home seaward of the CCCL.

52.     On June 28, 2012, after working with FDEP and the CITY, NATURAL LANDS filed its application for variance from the CITY's CCCL requirement along with an environmental assessment report that provided justification for the variance.

53.     On August 7, 2012, the CITY notified NATURAL LANDS that it also required a zoning hardship justification statement or report to be submitted along with the CCCL Variance Application.

54.     On October 8, 2012, NATURAL LANDS submitted a zoning hardship justification statement to the CITY.

55.     On October 19, 2012, the CITY notified NATURAL LANDS that the Lot Width and Front Yard Variance Application must be submitted to the CITY's Zoning Board of Adjustment (ZBOA) while the CCCL Variance Application must be submitted to the EAB.

56.     On November 15 2012, four (4) months after submitting the applications and reports, and after multiple telephone conferences and several meetings, the CITY requested revisions and additional information in the applications and environmental assessment reports.

57.     Later in November 2012, the CITY additionally requested an updated survey. A survey dated September 2011 was provided to the CITY along with the initial application on October 27, 2011, but the CITY demanded a newer survey.

58.     On December 14, 2012, NATURAL LANDS submitted a revised applications and environmental assessment report which contained information requested by the CITY to be

12

placed into the report.  NATURAL LANDS also submitted title research and updated surveys to the CITY as exhibits to the for CCCL Variance Application.

59.      On December 17, 2012, the CITY refused to place the CCCL Variance Application on the agenda before its Environmental Assessment Board for review and hearing on the merits, citing the need for an EAB review fee.

60.      On January 10, 2013, NATURAL LANDS paid the EAB review fee of $1,580.02.

61.      On January 23, 2013, NATURAL LANDS asked the CITY about the status of the CCCL Variance Application. The CITY gave no indication that the application was incomplete, only that work on the staff report had not begun.

62.      On March 4, 2013,  the CITY's outside attorney, Nancy Stroud, responded to NATURAL LANDS' status inquiry of January 23, 2013 and stated that the CCCL Variance Application was incomplete even though the updated survey had been submitted and the EAB fee had been paid.

63.      On April 13, 2013, counsel for NATURAL LANDS strenuously worded letter and sample complaint to the CITY demanding some action be taken on the applications that had been filed beginning some one and a half years before.

64.      On May 7, 2013, the CITY's outside attorney sent a response and memorandum from the CITY's Deputy Director of the City's Development Department stating that the CCCL Application was incomplete and NATURAL LANDS needed to provide eighteen (18) sets of plans drawn in engineering scale and three (3) signed and sealed surveys showing all proposed structures, easements, right-of-way and reservation for one single family home in a zoning district where the use is allowed as of right.

65.     For the previous one and one-half years until that date, the CITY had never before requested the that level of information or amount of documents from NATURAL LANDS in regard to any application.

66.     The fact that the CITY kept increasing its requests and changing the goal line for application completion is evidence of its true intent to deny any application by NATURAL LANDS to develop the PARCEL.

67.     Before the CCCL Variance Application by NATURAL LANDS, the CITY had never before requested such information from an applicant for a CCCL variance and no previous surveys submitted for CCCL variances were required to show the proposed structure.

68.     On July 12, 2013, the CITY informed NATURAL LANDS that it would now require payment of an additional $5,000.00 as a cost recovery fee in order to have the CCCL Variance Application reviewed by an outside consultant.  No prior CCCL variance applications indicated that such a fee or outside consultant was required by the CITY. No CITY ordinances appear to authorize the CITY to require an applicant to pay for an outside consultant review of its application.

69.     On July 17, 2013, NATURAL LANDS paid $5,000.00 to the CITY for review of its application after already paying an application fee of $3,125.00 on June 28, 2012 and the EAB review fee of $1,580.02 on January 13, 2013.

70.     On August 9, 2013, NATURAL LANDS was notified by  the CITY's outside counsel that the CCCL Variance Application file was forwarded  to its outside consultant, Michael Jenkins, Ph.D..

71.     Nowhere within the CITY public records were there any requirements or other justification for an EAB review of the CCCL Variance Application.  The decision by the CITY

14

to require NATURAL LANDS to endure such a review was arbitrary and capricious, intended solely for the purposes of delay, obfuscation, increased cost as precursor to the CITY's eventual denial of NATURAL LANDS' application to build a single family home on the PARCEL.

72.     Nowhere within CITY public records were there any requirement or justification for demanding an "environmental assessment" of the PARCEL.   The PARCEL was not identified by the CITY in current or future planning or zoning documents of record as being "environmentally sensitive land".   As such, the CITY's demands that the NATURAL LANDS expend time, money, and effort to produce such assessments or reports were arbitrary and capricious, intended solely for the purposes of delay, obfuscation, increased cost as precursor to the CITY's eventual denial of NATURAL LANDS' application to build a single family home on the PARCEL.

73.     Nowhere within CITY public records were any resolutions or ordinances that authorized CITY staff to forward CCCL Variance applications and environmental assessments or reports to outside consultants or to charge applicants additional fees for such reviews.

74.     For the next several months, between July 2013 and January 2015, NATURAL LANDS engaged in an extensive series of back and forth negotiations and correspondences with the CITY wherein the CITY continually engaged in the following delay and obfuscation tactics:

- demanding additional submissions of architectural, surveying, and engineering documents already on file;

- demanding environmental reports and assessments not clearly authorized or required by CITY zoning codes; and

- demanding additional payments for review of these same documents by outside consultants who were not direct employees of the CITY.

75.     NATURAL LANDS finally capitulated to the CITY's demands and paid for additional fees, reports, plans, and submissions while protesting the ability of the CITY to lawfully demand the same.

76.     During the time between October 27, 2011 and January 2015, NATURAL LANDS had focused on the CCCL Variance and were required by the CITY to re-apply for the Lot Width and Front Yard Setback variances they were initially told they needed on October 27, 2011. Again, all this activity was required by the CITY to unnecessarily delay building on the PARCEL where a construction of a single family detached dwelling is of right.

**2.     Second Lot Width and Front Yard Setback Application by NATURAL LANDS to CITY---2015 to 2016**

77.     On April 27, 2015, NATURAL LANDS  submitted its Second Lot Width and Front Yard Setback Application to the CITY seeking to build a single family detached dwelling on the PARCEL and paid an application fee of $3,095.00 to the CITY.

78.     Again, the CITY required NATURAL LANDS to undergo and endure this process with full knowledge that it was going to deny any application to build a single family detached dwelling on the PARCEL.  The CITY engaged in an additional four (4) year sham and charade application process solely for the purposes of delay, obfuscation, and increased cost to NATURAL LANDS intended to avoid the finality of its application process needed by NATURAL LANDS to seek review of the CITY's actions in a court of law. The CITY had already required NATURAL LANDS to go through this unnecessary process once before.

79.     During the entirety of the Lot Width, Front Yard Setback and CCCL Application processes, NATURAL LANDS continuously objected to the processes and asserted to the CITY and its COUNCIL that no legal justification existed for the CITY to demand that NATURAL

16

LANDS endure these additional procedures to build a single family detached dwelling on the PARCEL, as has been of right for the owner since before annexation by the CITY in 1955. However, because NATURAL LANDS believed that ultimately the CITY and its COUNCIL would act fairly and lawfully by honoring the vested rights of property owners in the R-3-F zoning district, it continued to participate in this clearly arbitrary, capricious, and unconstitutional process.

80.     On February 2, 2015, the CITY's environmental expert, Michael Jenkins, P.E., provided a draft evaluation report of the application and concluded that the proposed single family detached dwelling structure was consistent with the CITY's code requirements for coastal construction.  Mr. Jenkins also concluded in this draft that while a few secondary issues were identified, none precluded approval of the site development plan.

81.     Over the next several months, staff debated the application and requested additional information from NATURAL LANDS, which was provided to the CITY in a timely fashion. Finally, in late July 2015, CITY staff placed the matter for consideration on the August 13, 2015 agenda of the CITY's Zoning Board of Adjustment.

82.     The CITY's Zoning Board of Adjustment (ZBOA) is a sub-entity of the CITY created by its COUNCIL to review applications for (rezoning, variances, waivers, comp plan amendments, abandonments, etc.) and make quasi-judicial determinations on those applications. The ZBOA has been delegated full authority to approve, approve with conditions or deny the applications it reviews.  Decisions by the ZBOA are appealable to the COUNCIL. The COUNCIL appeal of a ZBOA decision is de novo and the COUNCIL is not bound in any manner, either legally or by custom, to strictly follow any prior decision made by the ZBOA.

83.     Despite having the application on hand for several months and despite having four (4) prior years of recent application history for the PARCEL within its public records, the CITY did not place NATURAL LANDS' application on the agenda for review before its Zoning Board of Adjustment until August 13, 2015.

84.     On August 13, 2015, the ZBOA met on the applications for variance and voted 3 to 2 to approve.  However, because the ZBOA needed 4 votes to approve a variance application, the applications were technically denied. A copy of Resolution BA-15-03 and Minutes of the Zoning Board of Adjustment for August 13, 2015 are attached as **Composite Exhibit 9** and incorporated by reference herein.

85.     On August 26, 2015, NATURAL LANDS appealed the denial by the ZBOA to the COUNCIL. A copy of the Notice of Appeal of ZBOA Resolution BA-15-03 is attached hereto as **Exhibit 10** and incorporated by reference herein.

86.     On September 22, 2015, the COUNCIL remanded the applications back to the ZBOA for further consideration. At this time, the COUNCIL knew it was going to ultimately deny NATURAL LANDS' applications to build a single family detached dwelling on the PARCEL, yet chose to engage further in its process of delay and obfuscation intended to increase costs, reduce morale, and cause NATURAL LANDS to abandon its efforts. The COUNCIL's failure and refusal to deny the applications outright was intended to avoid finality of the process and to prevent NATURAL LANDS from seeking review of the CITY's actions in a court of law.

87.     On November 12, 2015, the ZBOA denied NATURAL LANDS'  Lot Width and Front Yard Setback Applications for variances.

88.     In late November 2015, NATURAL LANDS appealed the decision of the ZBOA to the COUNCIL.

18

89.     On December 8, 2015, the COUNCIL adopted Resolution No. 155-2015, and approved the Lot Width and Front Yard Setback Application variances subject to the following conditions:

- The April 29, 2015 plans ("the April 29 Plans") shall be revised to eliminate any front yard encroachment (thus not requiring a front yard setback variance);

- The revised plans shall, in the discretion of the City Manager or designee, substantially conform to the April 29 Plans with regard to structural detail, massing, building height, and all other architectural characteristics, but shall eliminate any setback encroachment;

- The revised plans shall not extend any portion of the proposed building or other site improvements further eastward than shown on the April 29 Plans;

- The revised plans shall comply with all applicable codes and shall be subject to the requirements and procedures of Section 28-1556, the City's coastal construction setback ordinance; and

- The City Manager or designee shall verify compliance with these conditions prior to the issuance of a building permit for constriction of the proposed residence.

A copy of CITY Resolution 155-2015 is attached hereto as **Exhibit 11** and incorporated by reference herein.

90.     While it appeared that the CITY was granting NATURAL LANDS' applications to build a single family home on a lot where such use was zoned as of right,, the caveats and exceptions to its authorization were expressly inserted to allow for future denial of that use as the CITY always intended.

91.     The CITY conditioned its approval on a third approval process for NATURAL LANDS' CCCL Variance Application when the CITY knew it was going to delay the process and deny any CCCL Variance Application for the PARCEL.

92.     The members of the COUNCIL already knew that CITY residents were not in favor of allowing NATURAL LANDS to build a single family home on the PARCEL as the

19

property was one of only 3 developable lots on the beach east of the right-of-way for State Road A1A.

93.     The members of the COUNCIL knew or should have known that NATURAL LANDS would likely sue the CITY for taking its property if it outright denied the right to build a single family home on the PARCEL, since such use had been as of right since the CITY annexed the PARCEL in 1955.

94.     The COUNCIL's starts and stops within the approval process allowed it enough plausible deniability to claim that the process was final and worked to assuage NATURAL LANDS just enough to avoid a taking lawsuit by NATURAL LANDS.  In reality, the CITY knew it always intended to deny NATURAL LANDS' vested right to build a single family home on the PARCEL and began investigating acquisition of the PARCEL by partnering with the Greater Boca Raton Beach and Parks District (DISTRICT) and using their eminent domain powers.

95     All the prior efforts by the CITY to delay, obfuscate, and increase costs for NATURAL LANDS within the application process also had the intended effect of reducing or stagnating the market value of the PARCEL during a time when property values were generally rising on residences within the R-3-F zoning district.

**3.     Initiation of Efforts by the CITY and DISTRICT to Acquire the PARCEL.**

96.     Soon after December 8, 2015, many angry residents of the CITY contacted their elected officials on the COUNCIL to demand reconsideration of the partial variance approval and denial of all NATURAL LANDS' applications to build a single family home on the PARCEL.

97.     On December 10, 2015, the COUNCIL requested an opinion from the CITY's attorney who informed them that their vote on the ordinance and resolution actions could not be reconsidered by motion.

98.     On December 14, 2015, then CITY Mayor Susan Haynie, who was also a member of the COUNCIL, responds to an angry resident that the DISTRICT "should explore acquiring this lot as well as the lot opposite Blue Water Townhomes (Sweetapple Lot) and the Petruzzelli Duplex as they are both buildable lots as well. <u>The Greater Boca Raton Beach and Park District was created to purchase beach front property so it would not be developed.</u>"(emphasis added).

99.     On December 16, 2015, then CITY Mayor Susan Haynie sent a letter from the CITY to DISTRICT Board Chair Susan Vogelsgesang and requested the DISTRICT  to identify "all privately owned vacant buildable oceanfront properties in the City and evaluate possible acquisition of these properties by the District for preservation and public use."

100.    On December 18, 2015, DISTRICT Board Chair responded to CITY Mayor Haynie and stated that she would bring the matter before the DISTRICT Board for discussion and direct staff to begin investigation.

101.    On December 21, 2015, at DISTRICT's public meeting, CITY residents urge the DISTRICT to acquire PARCEL.  The Interim Executive Director of the DISTRICT, Arthur Koski, advised the DISTRICT Board to instruct him to determine whether there was consensus from the COUNCIL to acquire the properties, identify the properties to be acquired, calculate the expense of acquisition, and to determine the level of funding assistance to be provided by the CITY in acquiring the properties.

102.    On January 6, 2016, the DISTRICT deferred consideration of the request from the CITY's Mayor re: acquisition of the PARCEL until the COUNCIL indicated their intent to

35993372.5

proceed with the endeavor.   The DISTRICT ability to acquire property for beach or park purposes is subject to approval by the COUNCIL.

103.    On January 11, 2016, the COUNCIL adopted Resolution No. 12-2016, which formally requested the DISTRICT to consider acquisition of oceanfront properties in the CITY for preservation and public use.

104.    On February 1, 2016, the DISTRICT identified a list of privately owned vacant buildable oceanfront properties within the CITY.

105.    On February 16, 2016, the DISTRICT directed staff to contact the owners of the privately owned vacant buildable oceanfront properties to see if they had any interest in selling voluntarily.

106.    On March 7, 2016, the DISTRICT again authorized Interim Executive Director Arthur Koski and its staff to contact the owners of the privately owned vacant buildable oceanfront properties to see under what circumstances they would sell their parcels and under what conditions.

107.    On April 4, 2016, DISTRICT Interim Executive Director Koski informed the DISTRICT Board that one property was available at an amount he described as "over market price".

108.    On January 18, 2017, Mr. Koski advised the DISTRICT Board that the PARCEL was not for sale.

### 4.    CCCL Permit to NATURAL LANDS from FDEP--2016

109.    On February 15, 2016, NATURAL LANDS applied for a permit from FDEP to construct a single family home seaward of the CCCL in the CITY.

110.   As part of the application review process, the Florida Fish and Wildlife Conservation Commission ("FWC") is required to provide input to FDEP regarding any aspect of natural resources and wildlife that are not covered by FDEP.

111.   Over the next several months, NATURAL LANDS, FDEP and FWC conducted no less than sixteen (16) meetings, discussions, conferences, and document exchanges in review of the application.  The purpose of all these separate steps is to ensure that the proposed single family home would not result in any adverse environmental impacts or cause any take of marine life.

112.   NATURAL LANDS hired an environmental expert, Donald Richardson, Ph.D. to provide reports and guidance during this process.

113.   The CITY hired Kurt Rusenko, Ph.D. to provide advice and recommendations on behalf of the CITY. Several of the comments and/or suggestions made by Dr. Rusenko were incorporated into the application review process by FDEP and FWC.

114.   Dr. Richardson, Dr. Rusenko, FDEP and FWC all concluded that the project proposed in the application posed no adverse impacts to the beach/dune areas of the PARCEL or and no adverse impacts to potential sea turtle habitat.

115.   On June 6, 2016, the CITY provided a zoning confirmation letter executed by the CITY's Development Services Department to NATURAL LANDS stating that the PARCEL satisfies the minimum setback, zoning and lot size requirements for a single family detached dwelling.  A copy of the CITY's Zoning Confirmation Letter is attached hereto as **Exhibit 12** and incorporated by reference herein.

116.    On June 22, 2016, NATURAL LANDS updated its CCCL Variance Application with the CITY based on the CITY's zoning confirmation letter and information provided to FDEP and FWC by the CITY's environmental expert, Dr. Rusenko.

117.    On October 7, 2016, eight (8) months after the application process began, FDEP issued Permit Number PB-1196, which permitted construction of a single family detached dwelling on the PARCEL seaward of the coastal construction control line. Issuance of the permit was proposed final agency action on the application from FDEP and FWC.   Any party with standing that wished to challenge the Permit would have twenty-one (21) days (or until October 28, 2106) to file a challenge with the FDEP under Chapter 120, Florida Statutes--Florida's Administrative Procedures Act.   A copy of Permit PB-1196 is attached hereto as **Exhibit 13** and incorporated by reference herein.

118.    The CITY did not file any challenges to the final agency action of FDEP within the prescribed time and Permit Number PB-1196 became final with no challenges allowable.

119.    NATURAL LANDS spent over $200,000.00 to obtain Permit PB-1196.

120.    Remarkably, the FDEP and FWC—both state agencies with sixty-seven (67) Florida counties within their jurisdiction—were able to process NATURAL LANDS' application and to take final agency action on it within eight (8) months.  The speed of that process is in stark contrast with the extraordinary length of time the very same application and supporting documentation for a single family detached dwelling on the beach had been pending before the CITY. Such a contrast only highlights the depths to which the CITY had and would further sink to deny construction of a single family home on a property where such use was acknowledged by the CITY to be as of right from 1955 until the current date.

**5.    Third Application by NATURAL LANDS to CITY---2016 to 2018**

24

121.    Although the CITY had previously granted NATURAL LANDS application for lot width variance and for front yard setback requirements on December 8, 2015, and on June 6, 2016, acknowledged in writing that the PARCEL satisfied the minimum setback, zoning and lot size requirements for a single family detached dwelling,  the remainder of the application was conditioned upon the NATURAL LANDS again meeting the CITY's requirements for Section 28-1556, the CITY's coastal construction setback ordinance.  It was during this application process that the CITY and COUNCIL sank to new depths in their efforts to deny NATURAL LANDS the property rights it has to build a single family home on the subject PARCEL.

122.    Rather than simply acknowledge the truth of their prior recent actions and admissions and stand behind them, the CITY began a new and salacious campaign to undermine its own municipal authority, the authority of the State of Florida, the Constitution of the State of Florida and the Constitution of United States of America.  Sadly, this was all done so by the members of the COUNCIL  in their belief that doing so would retain enough votes for their re-elections.

123.    After already spending five years denying the valid, constitutionally protected property rights of NATURAL LANDS, the CITY and COUNCIL then spent the next three (3) years twisting itself into a pretzel to avoid facing its citizens who demanded complete destruction NATURAL LANDS' property rights after the CITY publicly established their existence.

124.    On August 9, 2016, NATURAL LANDS met with the CITY's Acting Director of Development Services and Deputy City Manager to discuss revisions to the April 29, 2015 Plans to meet Condition No. 1 of CITY Resolution 155-2015.  NATURAL LANDS revised the plans in conformity with the demands of the CITY and submitted them on September 16, 2016.

125.    In late October 2016, once again, unsurprisingly,  the CITY claimed the revisions it demanded be made by NATURAL LANDS in August 2016 did not satisfy Condition No. 1 of CITY Resolution 155-2015. The CITY once again demanded the CCCL Variance application be revised.

126.    On November 2, 2016, NATURAL LANDS and its architect of record again met with the CITY to try an understand the CITY's objections and get further direction on additional revisions to satisfy CITY staff.  After this meeting, NATURAL LANDS and its consultants took their time and ensured that every aspect of their CCCL Variance application would meet with CITY demands.

127.    On November 29, 2016, the CITY attempted to rescind the zoning confirmation letter it wrote to NATURAL LANDS on June 7, 2016, despite the fact that the zoning confirmation was based on CITY Resolution 155-2015 granting the Lot Width and Front Yard Setback Variances. A copy of the CITY's Letter of Rescission of Zoning Confirmation Letter dated November 29, 2016 is attached hereto as **Exhibit 14** and incorporated by reference herein.

128.    On April 20, 2017, NATURAL LANDS submitted its revised CCCL Variance Application to the CITY complete with revisions demanded by the CITY at their August 9, 2016 meeting and their November 2, 2016 meeting.

129.    In furtherance of its scheme to delay and obfuscate the process, the CITY claimed that NATURAL LANDS' CCCL Variance application was not substantially similar to the updated application submitted in late June 2016.

130.    The CITY then refused to respond or reply to NATURAL LANDS in any fashion for another four (4) months.  Only on August 18, 2017 did the CITY respond to NATURAL LANDS in regard to specific details it claims were missing from the CCCL Variance application.

131.    On September 20, 2017, NATURAL LANDS submitted yet another CCCL Variance application with revisions demanded by the CITY.

132.    On October 17, 2017, NATURAL LANDS again met with the CITY to discuss the CCCL Variance application and the revisions demanded by the CITY.

133.    On October 24, 2017, the CITY again demanded that NATURAL LANDS resubmit its entire CCCL Variance application package to resolve discrepancies caused solely by the CITY's repeated and unnecessary revisions.  Clearly, the CITY had no intention of ever approving ANY CCCL Variance application submitted by NATURAL LANDS and simply demanded revisions to cause delay, obfuscation, increase costs toward the ultimate goal of making NATURAL LANDS abandon the application as other owners had done before with the PARCEL.

134.    NATURAL LANDS, clearly dejected and exasperated by the actions of the CITY, remained steadfast in its belief that it would be able to use its property for the one use the CITY stated publicly could be done on the PARCEL—building a single family home.

**6.      Fourth Application by NATURAL LANDS to CITY—2018-2019**

135.    On March 7, 2018, NATURAL LANDS made its fourth revised CCCL Variance Application  to the CITY.  The CITY again rejected the CCCL Variance Application and demanded revisions.

136.    On May 14, 2018, Nancy Stroud, outside counsel for the CITY, wrote that the CITY again required NATURAL LANDS to revise its CCCL Variance Application to reflect the newly adopted Building Height definition, submit its renewed CCCL Variance application to outside environmental consultants and the CITY's EAB, even though no CITY ordinances

required or authorized such review.  This unnecessary review was ordered by the CITY solely for purposes of delay in making any final decision on the CCCL Variance application.

137.    Apparently, on November 14, 2017, for the purpose of causing delay and obfuscation for this seventh (7th) year of NATURAL LANDS' effort to build a single family home on the beach, the  CITY and COUNCIL adopted a new definition of "Building Height" expressly in response to NATURAL LANDS' CCCL Variance Application.

138.    The CITY did not inform NATURAL LANDS regarding this rule change that clearly only affects three (3) parcels located within the CITY—the PARCEL and the other two buildable lots east of State Road A1A.

139.    The CITY adopted this new definition for the express purpose of causing the CCCL Variance Application to be denied and causing a diminution in  value for the PARCEL by restricting the size of single family home that could be built on it.

140.    NATURAL LANDS objected to the imposition of a new rule and requirements in the permitting process that it and the CITY had been engaged in for seven (7) years.

141.    On May 18, 2018, COUNCIL Member Andrea O'Rourke  responded to citizen inquiries regarding the PARCEL by writing, "[a]s an elected official, I can promise you I will do everything within my power to prevent building on these beachfront properties."

142.    On May 25, 2018, COUNCIL Member Andrea O'Rourke  responded to another citizen inquiry regarding the PARCEL by writing, "I want to reassure you that I have no intention of granting any variances seaward of the Coastal Construction Control Line as defined by the State of Florida. "

143.    Once again, the CITY unlawfully demanded that NATURAL LANDS pay for the outside environmental consultant review of the completed CCCL Variance Application.

35993372.5

144.    Once again, the CITY forced NATURAL LANDS to pay for the CITY hire Michael Jenkins, P.E., as an outside environmental consultant to review the CCCL Variance Application that had been revised numerous times previously to conform with the CITY's demands and the CITY's newly adopted Building Height restrictions.   This was the second time the CITY forced NATURAL LANDS  to pay for the same coastal engineering and environmental review from Mr. Jenkins.

145.    Mr. Jenkins' previous review of the CCCL Variance Application from February 2, 2015, before NATURAL LANDS incorporated all the revisions and reductions demanded by the CITY between 2015 and March 7, 2018, concluded that the proposed single family structure was consistent with the requirements under CITY code for coastal construction.  Mr. Jenkins had also concluded that secondary issues with the CCCL Variance Application (presumptively those dune and sea turtle nesting concerns addressed in the 2016 FDEP CCCL Permit issued with input from the CITY) did not preclude approval of the CCCL Variance Application.

146.    It must be noted that in the time since NATURAL LANDS began its arduous journey to obtain a simple permit on October 27, 2011, nothing physically had changed with the PARCEL.  The only changes made to the CCCL Variance Application were those revisions demanded by the CITY for purposes of obtaining CITY approval.    FDEP and FWC had permitted the use seaward of the CCCL based on their consideration of the potential adverse impacts from a more expansive project than Mr. Jenkins was now asked to review again.

147.    On July 9, 2018, Mr. Jenkins submitted his draft environmental review report to the CITY's Senior Environmental Officer, Nora Fosman for review and editing. Ms. Fosman does not appear to be licensed as an engineer in the State of Florida and does not appear to hold any professional degrees, designations or certifications.

35993372.5

148.    On August 23, 2018, CITY Mayor Scott Singer responds to a resident and states. "[b]ased on the potential impact on our dunes and sea life (including turtles), I will NOT support granting a variance that would be needed to allow the coastal construction for this lot and the proposed home there.  My policy has been and still is to protect our beaches and green space."

149.    CITY Mayor Singer made this public statement with full knowledge that the PARCEL had been granted a permit to build seaward of the CCCL by FDEP and FWC.  Mayor Singer made this public statement with full knowledge that the CITY had not only participated in the permitting process by providing its own expert reports stating there would be no adverse impacts , but had stated in writing to FDEP and FWC that the PARCEL satisfied the minimum setback, zoning, and lot size requirements and could be developed with a single family detached dwelling.

150.     On September 7, 2018, after consulting with Ms. Fosman and other CITY staff on his environmental review report, Mr. Jenkins submitted his final signed and sealed environmental report to the CITY.

151.    The September 7, 2018 report  reached clearly opposite conclusions to Dr. Jenkins previous report from February 2, 2015 and the draft report he submitted July 9, 2018. Mr. Jenkins now concluded that the CCCL Variance Application should be denied due to "potential adverse impacts" to the dune system and sea turtle nesting habitat.  Mr. Jenkins conclusion was opposite the conclusion reached by FDEP and FWC in granting Permit PB-1196 that incorporated the concerns of the CITY's expert, Dr. Rusenko.

152.    It is clear the CITY refused to allow Mr. Jenkins to use any information from Permit PB -1196 or any reports, comments or opinions contained therein from Dr. Rusenko, the CITY's expert in the matter. It is clear that the CITY made Dr. Jenkins amend his draft report to

conform to the its publicly expressed wishes to preventing any lawful use of the PARCEL by NATURAL LANDS.

153.    The CITY then continued to delay and obfuscate the permitting process for the PARCEL for an additional six months, bringing the total time of delay to just under eight (8) years since NATURAL LANDS submitted its initial application to build one single family detached dwelling on its beach property.

154.    It is clear that COUNCIL Member O'Rourke and CITY Mayor Singer instructed CITY staff to reverse any prior public pronouncements regarding the eligibility for construction of a single family home on the PARCEL, ignore all prior resolutions granting variances for building, ignore all state permission to build seaward of the CCCL and create whatever justification was necessary to prevent NATURAL LANDS from building the proposed project on the PARCEL.

155.    These egregious acts, coupled with numerous more to follow, were performed with the express intention of preventing all economic and beneficial use of the PARCEL by NATURAL LANDS.   That these statements and actions by the CITY and its COUNCIL occurred during the backdrop of discussions between the CITY and DISTRICT to acquire the property using eminent domain, clearly indicates that these statements were also intended to cause a severe diminution in value for the PARCEL during any direct eminent domain proceeding initiated by either the CITY or DISTRICT.

**7.    CITY and DISTRICT Continued Discussions to Acquire PARCEL Using Eminent Domain**

156.    On August 24, 2017, the CITY inquired in writing to DISTRICT about whether the DISTRICT had considered using its eminent domain powers to acquire the PARCEL.

157. On August 30, 2017, the DISTRICT BOARD directed its staff to investigate the process of using eminent domain to acquire the PARCEL.

158. On September 5, 2017, DISTRICT directed its staff to begin the pre-suit process to acquire the PARCEL using eminent domain and hire eminent domain counsel.

159. On December 12, 2017, the DISTRICT obtained its preliminary appraisal valuation numbers for the PARCEL from Rob Callaway, a licensed state appraiser. Mr. Callaway's opinion of value was made "[w]ithout the benefit of a full analysis of the zoning, land use plan, and coastal construction line documentation that will undoubtedly show that numerous variances are required which will lead to a negative effect on values and a diminution in Market Value."

160. Clearly, the CITY and/or DISTRICT instructed Mr. Callaway to ignore all recent permit activity (FDEP/FWC Permit PB-1196; Resolution by CITY granting variances for width and front yard setback; conditional CCCL Variance granted by CITY) on the PARCEL and presume the parcel was without any entitlements whatsoever. Clearly, neither the CITY nor DISTRICT provided Mr. Callaway with the permits, letters, or resolutions which authorized uses for the PARCEL.

161. These actions by the CITY and DISTRICT in failing to properly instruct Mr. Callaway's scope of work or failing to present him with evidence of the PARCEL's recent entitlement history were taken for the express purpose of causing Mr. Callaway's valuation of the property to appear artificially low and create the appearance of a severe diminution in the value of the property.

162. On April 30, 2018, the DISTRICT's Executive Director, Arthur Koski, informed the BOARD that the CITY would not reimburse the DISTRICT for any costs of beachfront

property should the DISTRICT undertake eminent domain proceedings.  This indicated that the CITY was no longer interested in pursuing lawful acquisition and instead intended to force the attrition of NATURAL LANDS by denying its right to use the PARCEL  for any economic or beneficial use.

163.    At the same time as these discussions were ongoing, the CITY and its COUNCIL were unlawfully delaying NATURAL LANDS' fourth (4th) CCCL Variance Application, reversing its previous decisions to grant variances for the PARCEL, promising angry residents that "the CITY will never grant a CCCL variance" and further denying any economic or beneficial use of the property.  That such activity took place amid discussions between the CITY and DISTRICT to acquire the PARCEL using eminent domain is malfeasance at best and criminal at worst.

**8.    Final Hearing on NATURAL LANDS Fourth CCCL  Variance Application before the EAB and COUNCIL—2019**

164.    From September 7, 2018 until March 12, 2019, the CITY delayed taking any action on NATURAL LANDS' CCCL Variance Application despite repeated requests and inquiries from NATURAL LANDS as to the status of their application.

165.    On January 6, 2019, CITY and COUNCIL Mayor Scott Singer states in response to a resident inquiry, "[y]ou may be relieved to learn that neither I nor any members of the City Council have any plans to build anything on the beach." This further signals the CITY and COUNCIL's intent to deny the CCCL Variance Application arbitrarily and capriciously without any consideration of its code requirements.

166.    On March 12, 2019, the CITY advised NATURAL LANDS that its CCCL Variance Application would be scheduled for hearing before the EAB on April 10, 2019, giving them less than one (1) month notice. Despite the fact that the PARCEL is not designated by the

CITY as "environmentally sensitive lands" that would require a hearing before the EAB, the CITY unlawfully required NATURAL LANDS to undergo a review and hearing by the CITY's EAB.   Nothing in the CITY's codes requires this review for the PARCEL and the CITY demanded such hearing just for the purposes of delay, obfuscation, and increased costs to the NATURAL LANDS.

167.   On April 10, 2019, after a quasi-judicial hearing, the CITY's EAB voted 5-0 to recommend denial of the CCCL Variance Application. In support of its decision, the EAB relied heavily upon the report of Michael Jenkins, P.E., which had been heavily influenced by the CITY's staff and COUNCIL, whom had both publicly stated that they would allow no building on the beach.

168.   NATURAL LANDS continuously objected to the unlawful procedure of requiring an additional review designed solely for delay, obfuscation, increase of carrying costs, and aimed at creating further diminution in value for the PARCEL.   In spite of the CITY's determination to prevent use of its PARCEL, NATURAL LANDS demanded a final hearing on the fourth CCCL Variance Application before the CITY COUNCIL.

169.   On July 9, the CITY provided NATURAL LANDS with notice that the CCCL Variance Application would be heard only two (2) weeks later on July 23, 2019, again giving NATURAL LANDS less than one month notice for this quasi-judicial hearing before the COUNCIL.

170.   On July 22, 2019, NATURAL LANDS submitted a Motion to Recuse three COUNCIL  members (Mayor Scott Singer, Council Member Andrea O'Rourke, and Council Member  Monica Mayotte) based on prior public statements from these COUNCIL members that would be prejudicial to the proceeding.   Each COUNCIL member had made public statements

that they would arbitrarily and capriciously deny any application for CCCL Variance, regardless of whether such application actually met the requirements of the CITY's Code of Ordinances. The Motion to Recuse was denied.

171.    On July 23, 2019, prior to the beginning of the COUNCIL's quasi-judicial hearing on NATURAL LANDS' CCCL Variance Application, NATURAL LANDS once again renewed its Motion for Recusal of the COUNCIL members who had publicly expressed opposition to the CCCL Application on the principle that they would not allow building on the beach, regardless of whether the application met the requirements. The COUNCIL again denied the Motion for Recusal.

172.    On July 23, 2019, the COUNCIL denied NATURAL LANDS' CCCL Variance Application 5-0, with no COUNCIL members abstaining. A copy of CITY Resolution Number 78–2019 is attached hereto as **Exhibit 15** and incorporated by reference herein.

173.    On July 23, 2019, CITY Mayor and COUNCIL Member Scott Singer celebrated the unanimous denial of the request for CCCL Variance, hailing it as a victory for the numerous Boca Raton residents against the property rights for one parcel owner, NATURAL LANDS.

174.    With that vote, the CITY and COUNCIL, after eight (8) years of delay, obfuscation, arbitrary and capricious behavior,  unlawful hearings and intentionally increased costs to NATURAL LANDS, denied the only use of the PARCEL that the CITY had recognized was as of right and which had been understood by the CITY to occur eventually on the PARCEL since it was annexed by the CITY in 1955.

175.    With that unanimous vote of denial, the CITY denied NATURAL LANDS any and all economic or beneficial use of its PARCEL. In doing so, the CITY  and caused a

35993372.5

regulatory taking of the PARCEL and imposition of unconstitutional conditions upon NATURAL LANDS using a *Penn Central*, *Chevron*, or *Koontz* analysis.

176.    The CITY and COUNCIL voted to destroy NATURAL LANDS' property rights in the PARCEL in order to placate an angry public and to avoid the cost of using eminent domain to lawfully acquire the PARCEL in violation of Florida law, the Florida Constitution and the United States Constitution.

## COUNT I—INVERSE CONDEMNATION

177.    Plaintiff, NATURAL LANDS, sues the CITY and DISTRICT for inverse condemnation, re-allege Paragraphs 1 through 176 above and incorporates the same herein and alleges:

178.    During the eight (8) year period of consideration of NATURAL LANDS' applications to build a single family home on the PARCEL, the CITY and DISTRICT conferred, discussed, and desired to prevent any development of the PARCEL by erecting roadblocks and taking action intended to defeat the efforts of NATURAL LANDS to construct a single family detached dwelling on the PARCEL.

179.    Between 2015 and 2018, the CITY and DISTRICT conferred, discussed, and desired to use their statutory powers of eminent domain to acquire the PARCEL. This public discussion of acquisition virtually destroyed the market for the PARCEL and destroyed any and all economic and beneficial use of the PARCEL. This acquisition effort was only halted due to the refusal of the CITY, COUNCIL, and DISTRICT to act in accordance with Florida law, the Florida Constitution and the United States Constitution to lawfully use eminent domain and spend public funds in furtherance of promises made to the public to prevent new construction on the beach.

180.    Since 2018, the CITY and DISTRICT declined to use their statutory eminent domain powers to acquire the PARCEL, and instead, continued to erect regulatory roadblocks that were precisely calculated to prevent NATURAL LANDS from making any economic or beneficial use of the PARCEL by building a single family detached home one it.

181.    Several elected officials publicly stated or intimated that the CITY's denial of NATURAL LANDS application to build a single family home on the PARCEL was a direct result of promises made to constituents during the 2018 election campaigns of several COUNCIL members.

182.    While such an arbitrary and capricious denial of NATURAL LANDS' application and refusal to allow development of the PARCEL may reflect the "will of the public" in the CITY, federal law is clear that "[T]he Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. U.S., 364 U.S. 40, 49 (1960). Here, NATURAL LANDS is being forced to bear the burden of the public's desire to stop new beach construction alone; that burden should be borne by the citizens of the CITY as a whole.

183.    As a result of the CITY's and DISTRICT's actions, the PARCEL owned by NATURAL LANDS cannot be used for any reasonable construction of a single family home as allowable under the CITY's code nor for any other reasonable useful purpose.  The PARCEL has been stripped of all economic and beneficial value and has been damaged by the CITY through eliminating any reasonable uses in the marketplace.

184.    Neither the CITY nor DISTRICT have paid just compensation to NATURAL LANDS or any compensation.

185.    The CITY's and DISTRICT's actions are in violation of the 5th Amendment to the United States Constitution, which provides "…; [n]or shall private property be taken for a public use, without just compensation."

186.    Inverse condemnation is a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency.  This is such an action.

187.    As a result of the CITY's and DISTRICT's actions, NATURAL LANDS has been required to hire the undersigned attorneys and law firm and is obligated to pay them attorney's fees.

188.    As a result of the taking of NATURAL LAND's real property, the CITY and DISTRICT are obligated to pay Plaintiff a reasonable attorney's fee.

WHEREFORE, Plaintiff requests the Court to: (i) enter an order determining that CITY and DISTRICT have taken Plaintiff's property without just compensation; (ii) once the Court has determined that CITY has taken Plaintiff' property, empanel a jury of nine (9) persons to view the subject property and to determine the just compensation, as provided by Federal law and Florida law, for the involuntary taking of the PARCEL; (iii) enter final judgment awarding just compensation for the involuntary taking of Plaintiff's property, taxing pre and post-judgment interest, and awarding reasonable attorney's fees and other reasonable costs incurred by them in the prosecution of this action, including, but not limited to, accountant's fees, engineering fees, appraisers' fees, biologists' fees, surveying costs, planner's costs, photographer's costs, court reporter's costs, engineering costs and all other reasonable and necessary expenses all as required by the U. S. Constitution and Florida law; and (iv) granting Plaintiff such other relief as justice

requires.

## COUNT II—UNCONSTITUTIONAL CONDITIONS DOCTRINE

Plaintiff, NATURAL LANDS, sues the CITY and DISTRICT for violating the unconstitutional conditions doctrine, re-allege Paragraphs 1 through 188  above and incorporates the same herein and alleges:

189.    On October 27, 2011, NATURAL LANDS, through an authorized representative, filed an application with the CITY for Planning Advisory Review ("PAR") for authorization to construct a single family detached dwelling on the PARCEL.

190.    Beginning on November 8, 2011 and continuing to the present day, the CITY has impermissibly denied NATURAL LANDS a government benefit—the right to build a single family home on property that has been zoned for single family homes since it was first platted in 1932.

191.    From the date NATURAL LANDS filed its application until the present date, the CITY has never had any intention of granting its application to build one single family home on the PARCEL, despite the fact that the PARCEL is zoned for single family homes and surrounded by single family and multifamily homes.

192.    The CITY has no constitutionally permissible reason to deny NATURAL LANDS' application.

193.    While the CITY knew it was going to deny NATURAL LANDS' application to build a single family home on the PARCEL, it never informed NATURAL LANDS of this fact and strung them along for eight (8) years and induced them to spend hundreds of thousands of dollars in pursuit of this illusory permission.

194. The CITY's denial of NATURAL LANDS' application did not have an essential nexus to the goal of preventing all single family homes or other residences from being constructed on the beach since there are already multiple residences and single family homes on the beach, east of State Road A1A, within a 100 yard radius of the PARCEL.

195. The CITY'S denial of NATURAL LANDS' application was not roughly proportional to the stated goal of preventing further use and erosion of the beach or environmentally sensitive areas since the PARCEL is not designated within an environmentally sensitive area by the CITY and the CITY and DISTRICT planned to acquire the PARCEL and turn it into a beach park for the public.

196. The CITY's demand for excessive additional and unnecessary approvals and environmental reviews unconstitutionally burdened NATURAL LANDS' ownership of the land by increasing costs to apply for building a single family detached home where the CITY had no intention of ever approving the application.

197. The CITY's financial demands on NATURAL LANDS during the futile application process exceeded any result the CITY could have expected to be achieved through taxation since obtaining title to the PARCEL through denial of uses was the CITY's goal.

198. During the entirety of the eight (8) year ordeal of application for use of a property that should have been as of right, NATURAL LANDS was forced by the CITY to pay application and review fees and pay money to generate engineering reports for an application the CITY always knew it was going to deny.

199. NATURAL LANDS was forced to cede and relinquish all rights to use its property in any reasonable manner due to the CITY's unreasonable and extortionate demands intended not to make a single family dwelling suitable for the character of the neighborhood, but

40

aimed at ouster of NATURAL LANDS from the PARCEL so the CITY and DISTRICT could convert the property to public use as a beach park and charge admission fees thereto.

200.    The Fourteenth Amendment to the U.S. Constitution prohibits the CITY from depriving any person of "life, liberty, or property, without due process of law"—both procedurally and substantively.

201.    As of July 9, 1868, any action taken by the CITY and DISTRICT must be consistent with the U.S. Constitution.

202.    For eight (8) years, the CITY and DISTRICT colluded, conferred, and conspired to deprive NATURAL LANDS of its vested right to build a single family home by making excessive demands arbitrarily and capriciously designed to deny NATURAL LANDS the government benefit available to other owners within the R-3-F zoning district—namely, the ability to build a single family detached home on their parcel.

203.    As a result of the CITY's and DISTRICT's actions, NATURAL LANDS has been damaged.

204.    The nature of the damage suffered by NATURAL LANDS is both the loss of all economic and beneficial use of the PARCEL that is subject of this lawsuit, but also hundreds of thousands of dollars expended by NATURAL LANDS over the eight (8) years it was led by the CITY to believe its application would not be denied.

205.    As a result of the CITY's and DISTRICT's actions, NATURAL LANDS has been required to hire the undersigned attorneys and law firm and is obligated to pay them attorney's fees.

35993372.5

206.    As a result of the imposing unconstitutional conditions on NATURAL LANDS during its application process, the CITY and DISTRICT are obligated to pay Plaintiff a reasonable attorney's fee.

WHEREFORE, Plaintiff requests the Court to: (i) enter an order determining that CITY and DISTRICT have imposed unconstitutional conditions upon the Plaintiff arbitrarily and capriciously and caused the loss of real and personal property without just compensation; (ii) once the Court has determined that the CITY and DISTRICT has imposed unconstitutional conditions upon the Plaintiff, empanel a jury of nine (9) persons to view the subject property and to determine the just compensation and damages, as provided by Federal law and Florida law, for the losses and damages caused by imposition of the unconstitutional conditions which caused an involuntary taking; (iii) enter final judgment awarding just compensation and damages for the imposition of unconstitutional conditions and involuntary taking of Plaintiff's property, taxing pre and post-judgment interest, and awarding reasonable attorney's fees and other reasonable costs incurred by them in the prosecution of this action, including, but not limited to, accountant's fees, engineering fees, appraisers' fees, biologists' fees, surveying costs, planner's costs, photographer's costs, court reporter's costs, engineering costs and all other reasonable and necessary expenses all as required by the U. S. Constitution and Florida law; and (iv) granting Plaintiff such other relief as justice requires.

## COUNT III—DECLARATORY JUDGMENT

Plaintiff, NATURAL LANDS, sues the CITY for declaratory relief, re-alleges Paragraphs 1 through 206  above and incorporates the same herein and alleges:

207.    The CITY's zoning district R-3-F permits a single family home as of right.

208.    Throughout the history of the property after platting, either the County or the CITY has made exceptions for strict zoning code requirements to permit an owner to build a single family home.

209.    When the PARCEL was subject to County zoning prior to annexation by the CITY, the County expressly made exceptions for non-conforming lots under the grandfathering provisions of the Zoning Code first enacted by the County in 1957.

210.    The PARCEL met all zoning code requirements of the CITY for a single family home as of right when it was first annexed by CITY.

211.    The CITY last changed its zoning requirements for the PARCEL to R-3-F—residential--in 1976.

212.    The PARCEL has remained unchanged since the CITY last changed its zoning code.

213.    The CITY has known, since it annexed the PARCEL in 1955, that someday, an owner would build, at minimum, a single family detached  home on the PARCEL. This fact is reflected in all CITY comprehensive planning and zoning documents and ordinances.

214.    The CITY has spent eight (8) years arbitrarily and capriciously denying NATURAL LANDS the right to erect a single family detached dwelling structure on the PARCEL, even though the CITY knows the PARCEL may be developed as such as of right.

215.    The CITY executed a Zoning Confirmation Letter on June 7, 2016 which stated and acknowledged that the PARCEL satisfied the minimum setback, zoning, and lot size requirements for construction of a single family detached dwelling.

216.    NATURAL LANDS is uncertain of the rights, duties, and obligations imposed upon the PARCEL by the CITY and is in need of a declaration of the rights the PARCEL possesses under Florida law.

217.    NATURAL LANDS is in doubt about the effects of the CITY's zoning code on its ability to develop the PARCEL with a single family detached dwelling.

218.    Specifically, NATURAL LANDS needs a declaration regarding whether the ability to build a single family detached dwelling on 14,212 square feet or 0.32 acres of real property in a district zoned R-3-F by the CITY is a vested right and may be relied upon now and in the future.

219.    The CITY's arbitrary and capricious denial of NATURAL LANDS right to build a single family detached dwelling on the PARCEL has effected a taking of the parcel by the CITY.

220.    NATURAL LANDS has a right to declaratory relief pursuant to Chapter 86, Florida Statutes.

WHEREFORE, NATURAL LANDS requests the Court to enter judgment against CITY declaring that its action has or, alternatively, will, in the future, constitute a taking of NATURAL LANDS' property.  NATURAL LANDS demands a trial by jury of all issues so triable.

### Relief Requested

WHEREFORE, Plaintiff respectfully requests that this Court:

A.    Declare that the CITY and DISTRICT have taken NATURAL LANDS property without just compensation in violation of the takings clause of the Fifth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. §1983;

35993372.5

B.     Declare that the CITY and DISTRICT have violated NATURAL LANDS due process rights and have demanded unconstitutional conditions and exactions in exchange for a government benefit in violation of the taking and due process clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. §1983;

C.     Declare the rights and obligations between the CITY and NATURAL LANDS for the R-3-F Zoning District as they relate to the PARCEL that is the subject of this lawsuit;

D.     Award attorney's fees, costs, and expenses under 42 U.S.C. §1988; and

E.     Grant any other relief as the Court may deem just and proper.

DATED: October 16, 2019.                    Respectfully submitted,

                                            By:*/s/ Alan G. Kipnis*
                                            Alan G. Kipnis
                                            Florida Bar. No. 181788
                                            E-Mail: Alan.Kipnis@saul.com
                                            Steven M. Dickstein
                                            Florida Bar No. 1010439
                                            E-Mail: Steven.Dickstein@saul.com
                                            **SAUL EWING ARNSTEIN & LEHR, LLC**
                                            200 South Biscayne Blvd., Suite 3600
                                            Miami, FL 33131
                                            Telephone:  (305) 428-7612

                                            Keith L. Williams
                                            Florida Bar No. 135615
                                            E-Mail: Keith.Williams@saul.com
                                            Keith M. Poliakoff
                                            Florida Bar No. 477656
                                            E-Mail: Keith.Poliakoff@saul.com
                                            **SAUL EWING ARNSTEIN & LEHR, LLC**
                                            200 East Las Olas Blvd., Suite 1000
                                            Ft. Lauderdale, FL 33301
                                            Telephone: (954) 713-7600

                                            *Attorneys for Plaintiff, NATURAL LANDS, LLC*

35993372.5